UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INTERNATIONAL ENGINEERING & CONSTRUCTION S.A. and GREENVILLE OIL & GAS CO. LTD.,

    Petitioners,

-against-

BAKER HUGHES, A GE COMPANY, LLC and BAKER HUGHES, A GE COMPANY,

    Respondents.

18 - Civ -   (   )

**PETITION TO COMPEL ARBITRATION**

---

    Petitioners, International Engineering & Construction S.A. ("IEC") and Greenville Oil & Gas Co. Ltd. ("Greenville") (collectively "Petitioners"), by their attorneys, Freehill Hogan & Mahar LLP and Baker Botts LLP, as and for their petition to compel arbitration against Baker Hughes, a GE Company, LLC ("BHGE LLC") and Baker Hughes, a GE Company ("BHGE") (collectively the "Respondents" or the "Baker Hughes/GE Entities"), allege upon information and belief as follows:

## JURISDICTION

    1.    This is an action to compel arbitration of claims for damages arising under a series of three (3) related contracts involving: (i) the sale of two small-scale LNG liquefaction Plants (hereinafter the "Equipment Contract"); (ii) the provision of personnel to supervise the erection, commissioning, and operation of the Plants (hereinafter the "Services Agreement"); and (iii) a guarantee of performance under the Services Agreement (hereinafter the "Guarantee Agreement") (collectively the "Contracts").

492747.1

2. The action falls under the Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331 in that it arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201, 203 (the "Convention"), as supplemented by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA").

3. In addition, the Court has diversity jurisdiction of this matter pursuant to 28 U.S.C. § 1332 in that the Petitioners are business entities organized and existing under the laws of foreign countries, the Respondents are business entities organized and existing under the laws of the state of Delaware, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

4. Venue is proper in this District because Section 204 of the Convention provides that a petition to compel arbitration can be brought in any district "which embraces the place designated in the agreement as the place of arbitration if such place is within the United States", and each of the three (3) subject contracts, as discussed more fully below, provides for arbitration in the City of New York.

## THE PARTIES

5. At all times material hereto, Petitioner IEC was and still is a foreign business entity duly organized and existing under the laws of Luxembourg, with an office and business address at Rue de Neudorf 36, L-2222 Luxembourg, Luxembourg. IEC was the buyer of the Plants under the Equipment Contract, the recipient of the services under the Services Agreement, and the beneficiary of the guarantee of performance of the services contract under the Guarantee Agreement (all as described in greater detail below).

6. At all times material hereto, Petitioner Greenville was and still is a foreign business entity duly organized and existing under the laws of the Federal Republic of Nigeria,

2

492747.1

with an office and business address at 45B T.Y. Danjuma Street, Asokoro, Abuja F.C.T., Nigeria.

7. Greenville is a wholly owned subsidiary within the IEC structure of companies, is under the control of IEC, was formed for the purpose of operating the Plants in Nigeria and producing/selling the LNG, and was a third-party beneficiary of the equipment and services sold under the Contracts.

8. At all times material hereto, Respondent BHGE LLC was and still is a company organized and existing under the laws of the State of Delaware with an office and/or agent for the receipt of service in care of The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

9. BHGE LLC was and still is, for the reasons outlined more fully below, a successor to and/or alter ego of the original performing parties under the Contracts which are the subject of this Petition, and is otherwise estopped from avoiding the subject arbitration involving Petitioners' claims for the breaches and losses suffered.

10. At all times material hereto, Respondent BHGE was and still is a corporation organized and existing under the laws of the State of Delaware with an office and/or agent for the receipt of service in care of The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

11. BHGE was and still is, for the reasons outlined more fully below, a successor to and/or alter ego of the original performing parties under the Contracts which are the subject of this Petition, and is otherwise estopped from avoiding the subject arbitration involving Petitioners' claims for the breaches and losses suffered.

492747.1

## BACKGROUND FACTS

### A. IEC's Historical Business Presence in Nigeria & the Background to the LNG Contracts.

12. IEC, through affiliates, has had a long business presence in Nigeria, most recently in the bitumen trade where it established itself as the largest distributor in the country.

13. Bitumen is a product that must be maintained at high temperatures and, as such, energy cost is a key component in this business.

14. The IEC family of companies was innovative in their ability to capitalize on reductions in energy cost through novel transportation techniques, insulation, and, more recently, through alternative energy sources.

15. It was in connection with this effort to reduce energy costs that an examination was undertaken of the use of LNG as a heat source and eventually as a source of energy production (both on a large-scale, power plant-type application, as well as for use by individual businesses/industries) where LNG could be delivered on site, stored, and then consumed after passing through re-gasification equipment.

16. Given Nigeria's fragile electric distribution infrastructure, the introduction of LNG into the market presented an attractive alternative to conventional fossil fuels -- LNG being a proven safe, easily transportable, and less costly energy source that would bring stability and reliability to the market.

17. As early as 2013, and partnering with the Nigerian government in nationwide strategies to provide LNG to under-served electric regions of the nation, IEC embarked on an introduction of LNG into the Nigerian market through the purchase of small scale LNG facilities

that could be positioned near the gas sources, and from there, the liquefied gas transported by specialized trucks to the end-users throughout the nation.

18. The Nigerian government embraced the concept and committed to IEC for significant purchases in connection with a new power facility being constructed in Kaduna, Nigeria. IEC's market investigation (with individual power consumers) received overwhelmingly positive responses to this technology as a substitute for the existing, inherently unreliable power otherwise available in much of Nigeria.

19. By summer 2014, IEC was far along in negotiations with several recognized suppliers of small scale LNG facilities in China, including Sichuan Air Separation Group (SASPG) and EnCryo, and visited and reviewed their facilities in China in early August 2014.

20. SASPG was interested and made a proposal to IEC for two trains (including the full "balance of plant" ("BOP") components, such as storage tanks and truck loading racks) at a total price of $66 million. As part of its offer, SASPG would run the whole plant for one year and train staff to take over operations. SASPG, however, sought eighteen (18) months to deliver the Plants.

21. EnCryo, a similarly situated Chinese manufacturer, was also engaged with IEC in talks about such a purchase. EnCryo had previously entered into a joint venture with a U.S.-based manufacturer (Salof) that was also producing small-scale LNG Plants at its facility in Schertz, Texas. Salof manufactured these small-scale trains in modular skid configuration (for ease of erection on site).

22. As of the time of IEC's visit to China in August 2014, GE Oil & Gas, Inc., a Delaware company and a wholly-owned subsidiary of General Electric Company (hereinafter "GEOG"), had acquired Salof and its interest in EnCryo.

5

492747.1

23.     During the August discussion with EnCryo, IEC was introduced to David Gordon, who had been a principal of Salof and was now employed by GEOG.

24.     Mr. Gordon told IEC that GEOG was producing fully-modular, small-scale LNG production plants in its Schertz, Texas, factory. He explained that the Chinese LNG technology was inferior to GEOG's, and that IEC would be better served by purchasing pre-fabricated, fully-modularized LNG trains from GEOG in the United States. Aware of IEC's time requirements, Mr. Gordon told IEC that GEOG had one of these fully-modular plants completed and available for immediate purchase from its Texas factory. According to Mr. Gordon, the plant had been ordered by Shell Oil Company ("Shell"), but that Shell no longer wanted it and was looking to sell.

25.     Because timing, modularization, and quality were key attractions to IEC, it suspended its negotiations with the Chinese suppliers and shifted its focus to GEOG. Mr. Gordon invited the IEC team to review the "Shell" plant later that same month at the GEOG factory in Schertz.

26.     IEC's team flew to Houston in late August 2014. Upon landing, they were surprised to learn that the Shell plant was no longer for sale.

27.     GEOG nonetheless assured IEC that it could accommodate IEC's needs both with respect to delivery dates, modularization, and quality. The IEC team continued to GEOG's factory in Schertz, Texas, to inspect the Shell plant and the ex-Salof (now GEOG) production facilities where the plant remained. GEOG assured IEC that more such LNG trains -- built with GEOG's superior American technology and quality -- could be built for IEC, with delivery of two trains in nine (9) and twelve (12) months, respectively.

492747.1

28. Based on those commitments, IEC initiated negotiations with GEOG for the purchase of two trains, which negotiations eventually resulted in the Equipment Contract referenced below under which IEC purchased two (2) trains with an option for two (2) more.

**B. The Parties' Agreements, Including the Equipment, Services and Guarantee Contracts.**

29. In connection with GEOG's solicitation of the business, it re-confirmed to IEC the representations made in China regarding GEOG's expertise in engineering and fabricating fully modular, small-scale trains capable of producing 0.25 MTPA of LNG, tropicalized to withstand the rigors of the harsh Nigerian southern climate, and suitable for the expected gas, all for complete delivery within IEC's timeframe (*i.e.*, 9 and 12 months).

30. At the insistence of GEOG, and to demonstrate its bona fide interest in such a deal, IEC executed an initial letter of agreement that memorialized these main terms. IEC then began to negotiate, in earnest, a detailed sales, services, and guarantee set of contracts, which GEOG pressed IEC to finalize and execute within six (6) days.

31. The first contract was the sales agreement (entitled "Contract for the Sale of Two Small Scale (SCMR) LNG Plants") referred to herein as the "Equipment Contract", which memorialized the specifics of the purchase and sale of the two trains, that is, two fully modular, small-scale LNG production plants (the "Plants"). The Equipment Contract required GEOG to "sell and deliver the Plants (and Technical Documentation) to Buyer by their respective Delivery Dates, all in compliance with all other obligations under the Agreement."

32. The Equipment Contract also provided for arbitration of any disputes between the Parties in New York under the AAA Commercial Rules before three arbitrators, and to the extent the definition of "Seller" specifies both GEOG and "its successors," the Respondents (as

successors) are bound to the agreement to arbitrate along with GEOG. (*See* Sections 1 & 20 of the Equipment Contract, annexed hereto as IEC Ex. 1 and incorporated by reference herein.)

33.     In full recognition of IEC's acknowledged lack of firsthand experience in the erection, commissioning, or operation of LNG Plants, GEOG assured IEC that because they would be delivering the trains in fully modularized, skid-based configuration, there would be no need for IEC to secure the services of a separate engineering, procurement, and construction contractor. But to ensure smooth, efficient and proper installation, commissioning and operation, IEC requested, and GEOG extended, a comprehensive "services package" under which GEOG's affiliate, GE International Operations (Nigeria) Limited ("GE Nigeria"), agreed to undertake all aspects of the program from a supervisory standpoint, promising qualified on-site supervision in Nigeria for the "installation, start-up, commissioning and testing of the plants ... as well as Buyer-employee training to ensure that the plants are properly installed and function to their desired and warranted capacities." IEC agreed, and entered into the Services Agreement (the "Services Agreement") with GE-Nigeria on the same day it signed the Equipment Contract.

34.     The Services Agreement also provided for arbitration in New York before a panel of three and for consolidation with any arbitral proceedings in respect to any disputes relating to the Equipment Contract. (*See* IEC Ex. 2, a copy of the Services Agreement and the relevant section providing for New York arbitration, annexed hereto and incorporated by reference herein.)

35.     To guarantee GE-Nigeria's performance of its obligations under the Services Agreement, GEOG entered into a Guarantee Agreement with IEC, guaranteeing that all aspects of the services to be provided by GE-Nigeria would be backed up by GEOG (the "Guarantee Agreement").

8

36. The Guarantee Agreement similarly provided for arbitration under the same dispute resolution provisions as were found in the Equipment Contract and the Services Agreement. (*See* IEC Ex. 3, the Guarantee Agreement with relevant section providing for New York arbitration, annexed hereto and incorporated by reference herein.) (All three (3) of the above-referenced contacts are hereinafter collectively referred to as "The Contracts".) Under the Equipment Contract, IEC agreed to pay a substantial premium for the Plants over the price quoted by SASPG, with an additional substantial sum to be paid under the Services Agreement, notwithstanding that the Plants were being sold without the BOP, which was encompassed by the SASPG offer.

37. IEC agreed to this substantial premium because of the time and quality advantages that GEOG promised: delivery in (9) nine and (12) twelve months of two fully-modularized LNG trains produced by GEOG with superior, state-of-the-art technology, together with a complete supervisory support package that would ensure proper erection, commissioning, operation, and a guaranteed quantity of LNG production.

38. GEOG and GE-Nigeria knew, however, that they did not have the resources or capabilities to meet the commitments they were making. Indeed, GEOG's manufacturing facility in Schertz was struggling -- from both a production capacity standpoint and from a technical/engineering perspective -- stemming from an existing order that would keep the only facility GEOG had busy for years. Notwithstanding these known (but unrevealed) impediments to production, GEOG made false promises to induce IEC to buy from GEOG and eliminate the risk IEC would return to China for the purchases.

C. **The Three Contracts Have Not Been Performed.**

39. The performance of the Contracts has been abysmal.

9

492747.1

40. It is now October 2018, and GEOG has still not delivered either of the Plants in full. Significant portions of the equipment that GEOG has delivered, *inter alia*: (i) was not properly designed, manufactured, or tested under the Equipment Contract; (ii) was not fully modularized; and (iii) suffers from gross defects in engineering and manufacture that render it inoperable, unsuitable for the tropical Nigerian climate, and unable to survive its required twenty (20) year design life. GE-Nigeria, meanwhile, has provided unqualified supervisors who have proved incapable of providing the service pledged under the Services Agreement and GEOG, as guarantor, has not stepped in to rectify those deficiencies.

41. The end result of the gross negligence and willful misconduct visited upon Petitioners is a project now years behind schedule, with a loss of market and damage to reputation and good will, adversely affecting public perception from which Petitioners may never recover, and losses/damages running in the hundreds of millions of dollars, arising, *inter alia*, from the need to purchase additional components to render the Plants functional, loss of useful life, increased OPEX during the period of non-performance, losses to bring the Plants up to OSHA standards, lost profits and dividends due to the inability to operate the Plants, as well as interest and costs (which are discussed below).

42. While Petitioners recognize that this forum is not the situs for the adjudication of the individual claims, the damages and losses suffered by Petitioners are significant, and include, without limitation, the cost of engineering and acquiring additional components needed to rectify GEOG's design flaws, loss of useful life of the Plants and other related equipment, loss of warranty value on equipment left idle due to GEOG's failed performance, OPEX during idle periods required to rectify design flaws, as well as lost profits/diminution in value resulting from the inability to bring the Plants online. Total damages are expected to exceed $500 million.

492747.1

43. The aforesaid identification of damages is submitted without prejudice to Petitioners' right to supplement the losses/calculations in the arbitration proceedings, especially because the breaches continue to accrue under the Contracts, and the claims/losses evaluation is under active review.

44. Petitioners' losses will also include interest at the country-risk rate for Nigeria, together with recovery of the fees, expenses and professional services/costs incurred in connection with the presentation of the claims in arbitration.

## COMMENCEMENT OF ARBITRATION AGAINST GEOG, GE NIGERIA, AND THE BAKER HUGHES ENTITIES

45. As explained above, all of the Contracts provided for arbitration in the City of New York and consolidation of any disputes relating to the Contracts in a single proceeding.

46. On July 31, 2018, Petitioners commenced arbitration proceedings under the AAA Rules, by the filing of a Demand for Arbitration of all disputes arising under the Contracts (as well as several other contracts which relate to this project, but are *not*, for the time being, the focus of this litigation). (*See* IEC Ex. 4, a copy of Demand for Arbitration dated July 31, 2018 (without exhibits), and later assigned ICDR (AAA) Case No. 011800029174, annexed hereto and incorporated by reference herein.)

47. A challenge has been raised in the arbitration by counsel for the respondents in those proceedings about whether Greenville has the ability as a non-signatory to enforce the arbitration provisions contained in the subject contracts and hence is a proper arbitral claimant. The arbitrators will address that challenge and decide whether Greenville is an appropriate claimant in the arbitration proceedings. With the filing of the captioned suit, Greenville does not submit to the Court the question of Greenville's status as a proper arbitral claimant. Greenville

11

has joined IEC as a Petitioner herein to ensure that the Court's decision on the issue of whether the two Baker Hughes/GE Entities are required to proceed to arbitration on the substantive claims under the subject contracts equally applies vis-à-vis Greenville's claims, if the arbitrators ultimately determine that Greenville is a proper arbitral claimant.

48. The Demand for Arbitration identified as Respondents: GEOG, as seller under the Equipment Contract and as guarantor under the Guarantee Agreement; GE Nigeria, as nominal services provider under the Services Agreement; and the two Baker Hughes/GE Entities, named in the captioned Petition.

49. As detailed below, upon information and belief, during the performance of the Contracts (but before the commencement of arbitration), General Electric Company, as the parent GE holding company of all GE subsidiaries, including GEOG and GE Nigeria, entered into a "Transaction Agreement and Plan of Merger" with Baker Hughes, Inc. (and related entities).

50. According to publicly-available information, by virtue of the merger, the GE "oil and gas business" (including assets and liabilities held by General Electric Company subsidiaries involved in the GE oil and gas business) was transferred into a new entity, BHGE LLC.

51. BHGE LLC is ultimately owned, in part, and controlled fully by BHGE.

52. After the above-mentioned merger, communications with GEOG and GE Nigeria regarding implementation of the Contracts were handled under the BHGE company banner (including but not limited to communications regarding claims, outstanding deliveries, rectification of defects, continued performance, services, meetings, etc.), Petitioners having been advised previously that the GE Oil and Gas "business" was transferred into the new BHGE entity. (*See, e.g.*, IEC Ex. 5.)

53. That the Contracts were being implemented post-merger by BHGE and/or BHGE LLC was consistent with the planned merger as reported in filings with the SEC.

54. Petitioners' Demand for Arbitration of claims under the Contracts, therefore, identified GEOG and GE Nigeria (the original performing parties), as well as the new BHGE LLC entity into which the Contracts had apparently shifted and the holding entity BHGE, based upon an indication during the AAA arbitration proceedings that this was the entity into which the former GE oil and gas business had been shifted.

55. While there was an indication early in the AAA arbitration proceedings that the Baker Hughes Entities would participate, they have since stated that they dispute whether they are bound by the arbitration agreement in the Contracts. Presumably, they would also challenge whether they are bound by any award issued by the arbitrators, including one that holds they are bound by the agreements.

56. This Petition to Compel the Baker Hughes/GE Entities to arbitrate followed.

### AS AND FOR PETITIONERS' FIRST CAUSE OF ACTION FOR SUCCESSOR LIABILITY/STATUS

57. Petitioners repeat and re-allege each and every allegation as set forth in Paragraphs 1 - 56 above with the same force and effect as if fully set forth at length herein.

58. Upon information and belief, in 2017, General Electric Company merged its entire oil and gas business -- including all such business being carried on by subsidiaries (such as GEOG and GE Nigeria) -- into a new entity that would eventually become known as BHGE LLC. (*See* IEC Ex. 6, excerpted pages from Baker Hughes Inc.'s 14A filing with the SEC. The complete filing is available at https://investors.bhge.com/static-files/fd5f48b3-6c6c-4965-b604-ed04a5ff508b and describes the "combination of General Electric Company's ('GE') oil and gas business ('GE O&G') and Baker Hughes (the 'Transactions')," as involving, *inter alia*, the

13

492747.1

"transfer by GE to Newco LLC, following the Mergers and the Conversion of (1) all of the equity interests of the GE O&G holding companies that will hold directly or indirectly all of the assets and liabilities of GE O&G, including any GE O&G operating subsidiaries.").

59. Newco LLC, the company into which all of GEOG's oil and gas business, including **_assets and liabilities_**, were transferred, as described above, was a Delaware LLC formed to "own the combined businesses of Baker Hughes and GE O&G, as each existed prior to the consummation of the Transactions." (*See id.*).

60. Newco LLC was then renamed Baker Hughes, a GE Company LLC (*i.e.*, BHGE LLC). (*See* IEC Ex. 7, excerpts from BHGE LLC's Form 8-K filing with the SEC http://investors.bhge.com/static-files/250455b8-338a-404b-8f8e-5c6be1d614d2.)

61. GEOG, meanwhile, has no current employees, is not performing any business or selling any equipment, and is no longer engaged in the oil and gas business.

62. BHGE LLC is therefore answerable to Petitioners under the Contracts as an express successor, is bound by the arbitration provisions in each of the Contracts, and should be compelled to arbitrate in the ongoing AAA proceedings.

63. Alternatively, BHGE LLC is bound to proceed to arbitration under continuation of business and/or de facto merger successor liability in view of the fact that BHGE LLC, the new merged entity, is carrying on the identical oil and gas business previously performed by, among others, General Electric Company subsidiaries GEOG and GE Nigeria, with continuity of employees, supervisors, and senior management, continuity of business locations, and continued performance of the Contracts by BHGE LLC.

64. In addition, to the extent BHGE was an entity into which the oil and gas business was also transferred and/or which has continued to implement the Contracts, BHGE should equally be compelled to arbitrate along with BHGE LLC.

### AS AND FOR PETITIONERS' SECOND CAUSE OF ACTION TO COMPEL UNDER ALTER EGO PRINCIPLES

65. Petitioners repeat and re-allege each and every allegation as set forth in Paragraphs 1 - 64 above with the same force and effect as if fully set forth at length herein.

66. The facts and circumstances surrounding the merger and the continuation of the same oil and gas business under the Baker Hughes banner exposes BHGE LLC and BHGE to liability under the Contracts under standards for piercing the corporate veil, and with that comes the obligation to arbitrate.

67. Specifically, BHGE LLC is performing the same "oil and gas business" previously performed by GEOG and GE Nigeria.

68. The website utilized by BHGE LLC to describe its oil and gas business is the former GEOG website and includes the identical advertising previously used by GEOG relating to the supposed expertise in the manufacture and sale of small-scale, modularized LNG liquefaction Plants that are the subject of the Equipment Contract.

69. The same employees provided by GE Nigeria and guaranteed by GEOG who were on site in Nigeria before the merger have remained or have returned on site after the merger, as employees of the Baker Hughes/GE Entities.

70. The same middle-management that was involved in implementing the Contracts before the merger has substantially remained the same after the merger, with those employees now working for the Baker Hughes/GE Entities.

492747.1

71. The same senior management utilized by GEOG from Florence for the implementation of the Contracts during the period before the merger have remained the same after the merger, but are now employed by the Baker Hughes/GE Entities.

72. Petitioners have received correspondence subsequent to the merger under the BHGE LLC and/or BHGE banner, despite recent representations that the Contracts remain with the old entity, GEOG (which has now been converted to a Delaware LLC).

73. The same offices from which GEOG administered the Contracts in the period immediately before the merger, including the GE offices in Florence, are utilized for the continued implementation of the Contracts post-merger, but now bear the BHGE logo.

74. Contracts with GEOG for the sale and delivery of similar small-scale LNG plants, including sales contracts with Shell that were in existence prior to the merger, have since been identified as contracts whose performance has been assumed and assigned to the new BHGE LLC entity, but not left behind with the GEOG entity.

75. GEOG has no current employees.

76. GEOG is performing no business, selling no equipment, and is no longer engaged in the oil and gas business.

77. GE Nigeria has no current employees.

78. GE Nigeria is performing no business or providing any services in the oil and gas sector.

79. In fact, in a meeting between the Baker Hughes/GE Entities and Petitioners following the merger, the Baker Hughes/GE Entities admitted that GEOG no longer maintains independent finances and all monies payable to "GEOG" following the merger are routed to and recorded on BHGE LLC's balance sheet.

80. GEOG's former website directs the inquirer to the BHGE LLC website.

81. Subsequent to the merger, GEOG converted itself from a corporation to a limited liability company under Delaware law.

82. In the related filings made with the Texas Secretary of State, where GEOG had previously been registered to do business, GEOG applied to change its name to reflect its new LLC status and simultaneously filed an application for registration identifying three "governing persons" -- namely Maria Borras, Jacinth Smiley, and Brian Cothran -- each of whom were employees of BHGE LLC.

83. Based upon the foregoing, the effort to shield BHGE LLC and/or BHGE (the merged entity/ies) from liability under the Contracts by purportedly agreeing at or before the merger to "leave the Contracts behind" with GEOG and/or GE Nigeria (and thus try to leave Petitioners with remedies only against defunct shell entities) is ineffective. BHGE LLC and BHGE are the alter egos of the original parties to the Contracts (*i.e.*, GEOG and GE Nigeria), and the Baker Hughes/GE Entities are thus subject to the arbitration provision in the Contracts and should be compelled to arbitrate the claims before the AAA.

## AS AND FOR PETITIONERS' THIRD CAUSE OF ACTION FOR EQUITABLE ESTOPPEL

84. Petitioners repeat and re-allege each and every allegation as set forth in Paragraphs 1 - 83 above with the same force and effect as if fully set forth at length herein.

85. BHGE LLC and BHGE, having knowingly exploited and derived direct benefits from the Contracts, are equitably estopped from arguing that they are not subject to arbitrate the claims thereunder.

86. As noted above, GEOG does not maintain independent books and records such that any payments to GEOG relating to the Contracts would inure to the Baker Hughes entities.

17

Moreover, it was Baker Hughes, a GE entity, that pressed claims for compensation under the Equipment Contract and Sales Agreement. The claims appeared on Baker Hughes, a GE entity letterhead, and were executed by Marco Pagliaro, a Baker Hughes Project Manager, "on behalf of GE Oil and Gas LLC." *See* https://www.linkedin.com/in/marco-pagliaro-99b5375/ (visited on September 12, 2018). Since the merger, the Baker Hughes entities have benefitted directly from the Equipment Contract and Services Agreement, and must be estopped from simultaneously avoiding responsibilities for them.

87. BHGE LLC and BHGE also exploited and derived direct benefits from the Contracts by marketing the LNG Plants sold under the Contracts as projects "in development" on the BHGE website, enhancing the appearance of their experience and capabilities in order to generate new business opportunities for BHGE LLC and BHGE.

88. BHGE LLC and BHGE also exploited and derived direct benefit from the Contracts insofar as they are the performing parties following the merger, and they are directly gaining marketable experience, knowledge, and understanding of LNG plant design, construction, and engineering based on their ongoing involvement in the project.

WHEREFORE, Petitioners pray:

1. That in accordance with the applicable provisions of the Convention and the FAA, the Court enter an Order compelling Respondents BHGE LLC and BHGE to arbitrate as respondents in the AAA arbitration and respond to any award for damages suffered by Petitioners under the Contracts.

2. That this Court retain jurisdiction over this matter until a final award is entered herein under the terms of the Contracts pursuant to the provisions of the FAA for any enforcement that may be necessary.

3. That Petitioners be awarded the costs of this Petition, including disbursements and attorneys' fees and such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 9, 2018

          FREEHILL HOGAN & MAHAR LLP
          *Attorneys for Petitioners*

By: _____
      Peter J. Gutowski
      80 Pine Street, 25th Floor
      New York, NY 10005-1759
      (T): 212.425-1900 | (F): 212.425.1901

Baker Botts LLP
*Co-Counsel for Petitioners*

By:  /s/ Jay L. Alexander_____
      Jay Alexander
      30 Rockefeller Plaza
      New York, New York 10112-4498

     (*pro hac vice* application to be filed)